Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly brought before the Commission, are subject to and bound by the provisions of the Workers Compensation Act, and the Commission has jurisdiction over the parties and of the subject matter.
2. The employer-employee relationship existed between defendant-employer and plaintiff-employee at the time of plaintiffs injury.
3. The employer is self-insured with Key Risk Management Services as the servicing agent.
4. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
In addition, the parties stipulated into evidence an indexed packet of medical records and reports consisting of fifteen exhibits along with three additional exhibits, which were Commission forms, all of which were submitted after the hearing before the Deputy Commissioner.
***********
Based upon all of the competent evidence in the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty-six years old. She was employed by defendant in November 1988 as a secretary. Plaintiff had previously worked elsewhere in that capacity. Her job with defendant involved taking dictation, initially by shorthand, typing at a computer, filing, answering the phone, and doing some scheduling. Word processing comprised plaintiffs primary task. Plaintiffs workstation was configured such that the computer monitor and keyboard were too high and her chair was uncomfortable. No wrist rest was provided for plaintiff.
2. At some time during her employment with defendant, plaintiffs section moved to a new building. Consequently, she was required to answer the telephone for the entire building. There were up to one hundred calls per day and at times she would continue to type while talking on the telephone.
3. By 1991 plaintiff began to develop pain in her hands. She was treated at Kaiser and was seen by Pamela J. Whitney, M.D., a neurologist. Her condition was diagnosed as mild carpal tunnel syndrome, but Dr. Whitney also noted that plaintiff had left shoulder tendonitis/bursitis and diffuse myofascial syndrome. In March 1992, plaintiff was seen at Kaiser for complaints of right shoulder and elbow pain and bilateral hand numbness. Despite persistent pain, she continued to perform her regular job duties without complaint, although her co-workers noticed that she appeared to be having problems with her hands and arms. Her symptoms gradually worsened and she stopped taking dictation by shorthand and used a recorder instead.
4. On an unknown date in January 1994, plaintiff developed severe pain in her forearms as she was working. On 24 January 1994, plaintiff sought treatment from Robert J. Caudle, M.D., an orthopedic surgeon. Dr. Caudle thought that plaintiff probably had carpal tunnel syndrome and ordered nerve tests. Plaintiff reported her forearm pain to her supervisor. Defendant sent plaintiff to J. Stovall King, M.D., a neurosurgeon, who first examined her on 1 February 1994. At that appointment, plaintiff described intense pain from the back of her wrists and hands up to the back of her forearms and elbows. She also complained of pain in her shoulders. Dr. King ordered nerve tests that proved to be within normal limits. He decided that she did not have carpal tunnel syndrome or other entrapment neuropathies. Dr. King diagnosed plaintiff with bilateral deQuervains disease, which he attributed to her typing duties at work. He also diagnosed plaintiff with tendonitis of the right shoulder, which he did not relate to her employment. Plaintiff was taken out of work and treated with anti-inflammatory medication. She obtained only minimal relief of her symptoms, but Dr. King released her to return to work on a part-time basis on 21 February 1994. Plaintiff returned to work in a light duty position in March. However, she could not tolerate the typing or even the filing due to the pain.
5. On 1 April 1994, Dr. King advised defendant that in his opinion plaintiff had reached maximum medical improvement with regard to her tendonitis and that she could return to work without restrictions. However, he found that prolonged typing produced "a stinging discomfort in plaintiffs forearms. Dr. King rated plaintiff with fifteen percent partial disability to each arm.
6. Defendant suggested that plaintiff take a leave of absence to rest her hands. Plaintiff was not offered alternative employment, so she stayed out of work, thinking that her persistent symptoms would improve. In the meantime, plaintiff received treatment at Kaiser from R. Howard Pike, M.D., an orthopaedic surgeon. Dr. Pike diagnosed her with bilateral cumulative trauma disorder with neuritis, tendonitis, cubital tunnel syndrome, impingement at Guyons canal, deQuervains tenosynovitis, and rotator cuff tendonitis of the shoulders. Plaintiffs shoulder symptoms improved by April 1994. Dr. Pike restricted her from doing any typing at that time.
7. On 19 May 1994, plaintiff sought another opinion regarding her condition from S. Mitchell Freedman, M.D., a neurologist. Dr. Freedman examined plaintiff but could not identify a specific neurologic abnormality to explain her symptomatology. Based on patient history, Dr. Freedman diagnosed her condition as cumulative trauma disorder and recommended that she be evaluated by a rheumatologist.
8. Plaintiff continued to receive treatment at Kaiser until July 1994. Her symptoms did not improve and Dr. Pike began to question his diagnosis of plaintiff. No further treatment was provided by Dr. Pike after that time.
9. Defendant admitted liability for benefits under the Act for plaintiffs "DeQuervains Disease (Right Wrist) pursuant to a Form 21 Agreement for Compensation for Disability approved by the Commission. Compensation was paid to plaintiff for temporary total disability pursuant to that agreement. In June, the parties entered into a Form 26 Agreement for Compensation for plaintiffs permanent partial disability ratings given by Dr. King. The agreement was also approved by the Commission and plaintiff received compensation for fifteen percent permanent partial disability to each of her arms. Compensation was paid for seventy-two weeks beginning 18 April 1994. Plaintiff also began to receive disability benefits from the State of North Carolina.
10. In October 1994, plaintiff sought treatment from Glenwood Psychiatric Associates for depression that resulted from her on-going pain and disability. She also went to Elliot J. Kopp, M.D., a doctor specializing in allergies and rheumatology. Dr. Kopp did not find evidence of a rheumatological disorder and was of the opinion that his finding was indicative of DeQuervains tenosynovitis. He prescribed medication and recommended that she see George Edwards, Jr., M.D., an orthopaedic hand surgeon. Dr. Kopp also recommended that plaintiff see an Occupational Health specialist at Duke University Medical Center. Consequently, plaintiff sought treatment from Sam D. Moon, M.D., a physician in the Occupational Health Division at Duke University Medical Center. Dr. Moon diagnosed her condition as a complex musculoskeletal pain syndrome with many elements of a chronic pain syndrome and probably a regional myofascial pain syndrome. A question was raised as to whether plaintiffs psycho-social situation might be part of her problem since she had a history of panic attacks and had been experiencing depression. Dr. Moon changed her medication and recommended physical therapy.
11. Plaintiff then underwent a period of physical therapy that did not provide her with relief. On 23 January 1995, she returned to Dr. Moon who referred her to Alan Spanos, M.D., a pain specialist, for treatment of her chronic pain syndrome. Dr. Spanos evaluated her on 13 February 1995 and noticed that she had a very unusual pain syndrome. Plaintiffs condition was gradually worsening to the point where she was having difficulty performing fine motor tasks. Dr. Spanos indicated that she was unable to work and that the use of her hands for more than a few minutes resulted in increasing pain.
12. In November 1995, plaintiffs counsel referred plaintiff to Peter W. Gilmer, M.D., another orthopedic surgeon. Dr. Gilmer did not find a classic dystrophic appearance to her hands or enough evidence of carpal tunnel syndrome to warrant surgery. Further testing was not recommended by Dr. Gilmer.
13. Plaintiff next returned to Dr. Whitney who had treated her in 1991. Dr. Whitney reviewed her history and various treatments and concluded that plaintiff had had a very thorough evaluation. It was Dr. Whitneys opinion that her condition was probably a combination of tendonitis and repetitive motion disorder that had been unresponsive to treatment. Dr. Whitney made no further recommendations regarding medical treatment.
14. Despite the multiple medical evaluations and variety of medications she had taken, plaintiff continued to experience debilitating pain in her hands and arms. The severe pain limited many of her activities such as driving, writing, and housework. She read an article on cumulative trauma disorder written by Emil F. Pascarelli, M.D., of New York and decided to see if he could help her. Dr. Pascarelli performed a thorough examination of her on 23 May 1996. He had studied cumulative trauma disorders in musicians and secretaries and had discovered common characteristics of their symptoms and work conditions. Plaintiffs findings were typical of a cumulative trauma disorder, with her primary problem being a neurogenic thoracic outlet syndrome, a condition that contributed to many of her other diagnoses. Dr. Pascarelli made the following additional diagnoses: bilateral repetitive strain injury with chronic forearm myofascitis, bilateral cubital tunnel syndrome, bilateral deQuervains tenosynovitis, right lateral epicondylitis, bilateral medial epicondylitis, left carpal tunnel syndrome, right shoulder impingement, and postural misalignments. In Dr. Pascarellis opinion, plaintiffs clinical signs of reflex sympathetic dystrophy were likely related to thoracic outlet syndrome.
15. Dr. Pascarelli found plaintiffs condition to be severe and disabling. He prescribed medication and a very specific program of physical therapy that included home exercises. Because plaintiff lived in North Carolina, she was unable to attend Dr. Pascarellis physical therapy clinic in New York. When plaintiff returned to Dr. Pascarelli on 8 July 1996, she had some signs of improvement, but he continued to recommend the focused, aggressive physical therapy and home exercise program for her. Dr. Pascarelli was concerned that plaintiff was not getting the recommended physical therapy treatment from her local therapist. He felt that plaintiff would not reach maximum medical improvement until she completed the treatment program he designed for her.
16. Plaintiff subsequently underwent a period of treatment with Daljit Buttar, M.D., who administered trigger point injections and prescribed medication for her. She obtained some relief from his treatment but stopped seeing him because of the expense involved.
17. In September 1997, plaintiff returned to Dr. King at defendants request. At her appointment, Dr. King interviewed her but did not conduct an examination. Despite his failure to assess any physical findings, he concluded that her chronic hand and arm pain reflected a psychiatric disorder, not an organic one. Dr. King referred plaintiff to C. Thomas Gualtieri, M.D., a psychiatrist, for evaluation. Plaintiff went to Dr. Gualtieri in April 1998, but the psychiatrist found that she did not have an overt psychiatric problem or diagnosis. Any depression she had experienced since February 1994 had probably been caused or aggravated by her physical condition, but the depression appeared to have resolved by the time of his evaluation. Plaintiff returned to Dr. King who could not give a diagnosis and simply stated that she had "bilateral arm pain of unknown etiology.
18. Plaintiffs last evaluation was in September 1998 by Felix A. Evangelist, M.D., a thoracic surgeon. He concurred with the findings of Dr. Pascarelli and was of the opinion that plaintiff had severe thoracic outlet syndrome that appeared to be work-related. Dr. Evangelist also thought she had severe reflex sympathetic dystrophy. Nerve testing was then performed, the results of which were compatible with prominent bilateral thoracic outlet compression neuropathy and borderline carpal tunnel and ulnar tunnel compression.
19. By Form 18 Notice of Accident to Employer and Claim of Employee or His Personal Representative or Dependents filed 29 November 1994, plaintiff claimed compensation for "extreme swelling in both hands and forearms, including wrists, and in the right shoulder, and pain. Plaintiff claimed compensation for conditions other than the deQuervains disease referred to in the Form 21 Agreement for Compensation for Disability that was approved in this case. Defendant has not admitted liability for any conditions other than the deQuervains disease and has specifically refused to pay for medical treatment as part of her workers compensation claim for her other conditions.
20. Plaintiff has developed a number of related physical problems constituting a cumulative trauma disorder. Her cumulative trauma disorder includes components of neurovascular thoracic outlet syndrome, bilateral deQuervains tenosynovitis, bilateral cubital tunnel syndrome, and myofascial pain. The symptoms plaintiff developed in her hands, arms, and shoulders were due to her cumulative trauma disorder.
21. As a result of her duties as a secretary with defendant, plaintiff was placed at a increased risk of developing a cumulative trauma disorder as compared to members of the general public not so employed. The conditions of her employment and her job activities were a significant contributing factor in the development of her cumulative trauma disorder.
22. Plaintiffs cumulative trauma disorder was an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which was not an ordinary disease of life to which the general public was equally exposed.
23. The depression plaintiff developed in 1994 was a proximate result of her cumulative trauma disorder.
24. The evaluations and treatment rendered by Dr. King were inadequate to address plaintiffs cumulative trauma disorder.
25. As of the date of hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement with respect to her cumulative trauma disorder because she had not completed the physical therapy program recommended by Dr. Pascarelli.
26. Plaintiff has earned, since her injury, approximately $2,000.00 at sporadic employment babysitting; however, these earnings do not reflect wage earning capacity. Due to her injury, plaintiff remained totally disabled as of the date of the hearing before the Deputy Commissioner.
27. Defendant continued to pay disability benefits to plaintiff up to the date of the hearing before the Deputy Commissioner.
28. Plaintiffs counsel is entitled to an award of attorneys fee based on the total award to plaintiff prior to the deduction of defendants credit for State disability benefits paid.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The approved Form 21 Agreement for Compensation and Form 26 Supplemental Agreement as to Payment of Compensation do not bar plaintiff from filing a claim for conditions not encompassed by these agreements. Defendant denied liability for any conditions other than the deQuervains disease referenced in the Form 21 agreement. Consequently, plaintiff can make a separate claim for the other conditions involved with her cumulative trauma disorder.
G.S. 97-53.
2. Plaintiffs cumulative trauma disorder is an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. G.S.97-53 (13); Booker v. Duke Medical Center, 297 N.C. 458 (1979).
3. As a result of her cumulative trauma disorder, plaintiff is entitled to receive total disability benefits at the rate of $235.91 beginning 4 September 1995 and continuing until plaintiff returns to work or until further order of the Commission. G.S. 97-29. This amount is subject to a credit as allowed by statute for disability benefits paid to plaintiff from the State Retirement System plan. G.S. 97-42.
4. Plaintiff is entitled to have defendant pay for any medical treatment related to her occupational disease that is reasonably necessary to effect a cure, give relief, or lessen plaintiffs period of disability, including treatment at Glenwood Psychiatric Associates. G.S. 97-2(19), 97-59.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorneys fees hereinafter provided, defendant shall pay plaintiff compensation benefits at the rate of $235.91 per week beginning 4 September 1995 and continuing until plaintiff returns to work or until further order of the Commission. The portion of the compensation, which has accrued, shall be paid in a lump sum, subject to a credit to defendant for disability benefits paid to plaintiff from the State Retirement System plan.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her occupational disease that are reasonably necessary to effect a cure, give relief, or lessen plaintiffs period of disability, including her treatment at Glenwood Psychiatric Associates.
3. A reasonable attorneys fee in the amount of twenty-five percent of the compensation awarded for plaintiff is approved and allowed for plaintiffs counsel. The calculation of attorneys fee shall be based on the full award prior to the deduction of defendants credit pursuant to G.S.97-42. The attorneys fee shall be deducted from the compensation due plaintiff and shall be paid directly to plaintiffs counsel.
4. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement. In the event that the parties should be unable to agree on the amount of permanent partial disability compensation which may be due plaintiff, either party may request a hearing to resolve any such dispute at the appropriate time.
5. Defendant shall pay the costs.
 S/_______________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________ LAURA K. MAVRETIC COMMISSIONER